Filed 12/2/14  P. v. Bonilla CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B249622 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA399015) |
| MANUEL BONILLA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Henry J. Hall, Judge.  Affirmed with directions.

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted appellant Manuel Bonilla of six felony counts: First degree murder (Pen. Code, § 187, subd. (a), count 1);[1] possession for sale of methamphetamine (Health & Saf. Code, § 11378, count 2); possession for sale of cocaine (Health & Saf. Code, § 11351, count 3); possession for sale of cocaine base (Health & Saf. Code, § 11351.5, count 4); and possession of a firearm by a felon (§ 29800, subd. (a)(1), counts 5 & 6). The jury also found true the allegations in count 1 that appellant personally used and discharged a firearm causing great bodily injury and death within the meaning of section 12022.53, subdivisions (b), (c) and (d).

Appellant was sentenced to a total of 57 years to life in state prison, calculated as follows: On count 1, 25 years to life for murder plus 25 years to life for the greatest firearm enhancement (§ 12022.53, subd. (d)); on count 2, a consecutive eight months; on count 3, a consecutive one year; on count 4, a consecutive four years; on count 5, a consecutive eight months; and on count 6, a consecutive eight months.

Appellant contends (1) there was insufficient evidence to support some of his convictions, (2) the trial court erroneously instructed the jury; (3) section 654 precluded imposition of the consecutive sentence on count 5; and (4) he is entitled to one extra day of presentence custody credit. While we agree with the final contention, we find no merit to the others.

## FACTS

### Prosecution Case

#### The Murder

On May 8, 2012, between 12:45 a.m. and 1:00 a.m., the body of Rene Miranda (the victim) was found by a driver lying on the street at the corner of Normandie Avenue and 20th Street in Los Angeles. Autopsy reports revealed the cause of death was multiple gunshot wounds. The victim was shot in the right jaw, right upper back, and right hand.[2]

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Two of the three gunshot wounds were fatal.

2

A large caliber bullet was recovered from his body.[3] The victim had marijuana and cocaine in his system, but the drugs did not contribute to his death.

**Background Events**

Appellant was a drug dealer for the Harpys gang and the victim had a drug habit. During the month of January 2012, calls on appellant's phones were wiretapped pursuant to a court order. Portions of recorded calls were played for the jury. In the first recording, the victim told appellant he would pay extra money on his drug debt. Appellant demanded that he be paid immediately because he had not told "the homie," who thought the victim had already paid for the drugs. In the second recording, the victim told appellant that he had not paid because he got off work late. He agreed to pay extra and said it would be the last time appellant had to cover for him. In the third recording, the victim told appellant that he was fired from his job, but would go to appellant's house to pay.

The parties stipulated that on May 7, 2012, the day before the murder, appellant was at the Los Angeles Gun Range, a shooting range for target practice. All visitors were required to complete a questionnaire about their firearm experience before being permitted to shoot at the range. Appellant completed the questionnaire. When a group of people came to the range together, their questionnaires were stapled together. One of the questionnaires stapled to appellant's indicated that one of his companions bought 50 rounds of .40-caliber bullets for a handgun. There was no requirement that bullets purchased at the range had to be fired at the range.

The victim's relatives testified that between April 28 and May 7, 2012, he acted nervous, kept looking over his shoulder, and asked to borrow $100.

**Investigation**

The victim's cell phone was recovered at the scene. His wife confirmed that a number on the phone belonged to appellant, who was known as "Chito." Cell phone records for appellant's cell phone number indicated that the victim called appellant's cell

---

[3]     The parties stipulated that the shell casings and expended bullets recovered at the scene and the bullet in the victim's body were .40-caliber ammunition.

phone eight times between 12:33 a.m. and 12:43 a.m. on May 8, 2012, just before he was killed. Four of the calls were answered by voicemail and the remaining calls were unanswered. Appellant's cell phone connected to the same tower for all eight calls and did not leave the tower's mile and one-half range. The crime scene was within the range of the cell phone tower.

On the day of the murder, Los Angeles Police Department (LAPD) Detectives Matthew Gares and Herman Frettlohr went to appellant's apartment. Detective Gares saw a shadow at the bottom of the door and heard what sounded like someone running through the apartment. Appellant's girlfriend opened the door. Detective Gares saw drugs in the apartment and an open window. He looked out the window and saw appellant standing near a wooden ladder. When Detective Gares asked appellant to come inside the apartment, appellant said "yeah," then fled.

The detectives searched the area outside the apartment building and found a backpack with the "Angry Birds" logo on it. The backpack contained $368 in cash, a digital scale, and bags of drugs. The parties stipulated that the drugs recovered included 117.7 net grams of methamphetamine; 1.9 net grams of powder cocaine consisting of 11 individually wrapped bags; 78.4 net grams of crack cocaine consisting of nine individually wrapped bags; 1.4 grams of crack cocaine; 14.8 grams of powder cocaine; 3.5 grams of methamphetamine; and 0.14 grams of methamphetamine. Detective Frettlohr explained that these were large quantities of methamphetamine, crack cocaine, and powder cocaine. A usable amount of methamphetamine and crack cocaine was dependent on a user's tolerance, but could be less than 0.03 grams. The amount of drugs necessary for filing criminal charges was 0.03 grams.

Detective Timo Illig searched appellant's apartment and found the following: a closed circuit surveillance monitor in the bedroom; a nine-millimeter handgun in the bedroom closet; a square plate with a razor blade; two scales, one of which contained white residue; a toiletry bag containing two bags of methamphetamine and a glass pipe; three glass jars containing individual bags of marijuana; more than one cell phone; a binder with a calendar on the outside flap; and sheets of paper. One sheet of paper had

4

numbers written on it and the words "paid" and "owe." Another sheet had "I.O.U." written on it with six names. The third name on the I.O.U. list was "Rana," which was the victim's nickname. The number 170 was crossed out next to his name, and the number 100 was written, followed by 870. Detective Illig agreed that the sheet of paper was a "pay owe" sheet in which a drug dealer kept a list of people who owed money.

**Appellant's Admission**

On May 31, 2012, Detectives Gares and Frettlohr interviewed Lorrie Rodriguez (Rodriguez) in custody. The interview was played for the jury.[4] She told the detectives she been staying with a friend for two months until May 2012, and appellant had also stayed in the apartment. Rodriguez told the detectives that appellant was a gang member and drug dealer who always had drugs on him, and that he was the gang's "rent collector." She remembered that appellant had a backpack with the Angry Birds logo on it and what appeared to be a nine-millimeter gun inside the backpack.

Two days after the murder, Rodriguez was talking to her friend in the apartment, while appellant was about two steps away in the kitchen. Appellant was wearing a baseball hat, large glasses, and a Spider-Man backpack with a hoodie over his head. Rodriguez asked her friend why appellant was disguised like a little boy and acting paranoid. Her friend responded that appellant was wearing a disguise because he shot and killed someone and was in hiding. Appellant did not say anything in response.

Rodriguez turned and looked at appellant. He explained that he was involved in an argument two days earlier with someone who refused to pay "rent." Appellant said, "We took care of it" and "We took care of business." Rodriguez did not know to whom appellant referred when he said "we." Appellant also said, "I'm claiming it. I did do it." Appellant was smiling and said that he had a gun with him, the same one he used to shoot

---

[4]     Rodriguez testified that she was under the influence of methamphetamine when she spoke to the detectives. Based on Detective Frettlohr's training and experience in narcotics, it did not appear him to that Rodriguez was under the influence of drugs during their interview.

the victim.  Rodriguez saw the gun.  Appellant also said that he jumped out of the window when the police came to his apartment.

The detectives interviewed Rodriguez again in April 2013.  This interview was also played for the jury.  During the interview, Rodriguez told Detective Frettlohr that she was being threatened by appellant from jail not to testify and that she had been "green lighted," meaning that the gang could come after her.

**Expert Testimony—Narcotics**

LAPD Officer Will Lopez testified as a narcotics expert.  He explained that a pay-owe sheet was a record kept by drug dealers which showed the amounts owed and paid by buyers as well as the drugs that were sold, and that dealers recorded I.O.U.s for recurring customers.  He reviewed text messages on appellant's cell phone from April 30, 2012, to May 8, 2012.  The messages used street names for drugs and indicated that different people wanted to meet appellant for the purpose of buying drugs.

On May 8, 2012, at 12:42 a.m., a text message was sent from the victim's cell phone to appellant's cell phone, stating:  "Whats up fool I need a 40 and I need to pay. Let me know.  So I can get it somewhere else."  Officer Lopez explained that the message indicated the victim wanted to buy $40 worth of narcotics, if the drugs were unavailable he would go elsewhere, and he needed to pay his outstanding debt.  At 1:12 a.m., appellant's cell phone received a text message stating:  "Hey homie, just wanted to let u know that theres cops all around the area.  B trucha . . .  my boy.  If U anything let me know."  Officer Lopez explained that the sender was warning appellant that police officers were around, and that the term "trucha" meant be aware, be careful, or be alert.

Given a hypothetical based on the facts of this case, Officer Lopez opined that the totality of the evidence—the large amount of narcotics, the individual bags of narcotics, the scales, the cash, and the text messages—indicated that the narcotics were possessed for the purpose of sale.

6

**Expert Testimony—Gangs**

LAPD Officer Gabriel Roybal testified as a gang expert.  He was familiar with the Harpys gang, which claimed as its territory the area around the University of Southern California, including Normandie Avenue and 20th Street.  The Harpys gang controlled the drug trade in this area.

Officer Roybal had had seven to eight contacts with appellant.  Each time appellant admitted his membership in the Harpys gang.  Appellant also had numerous gang tattoos, which Officer Roybal described as photos were shown to the jury.  Appellant had a tattoo above one eyebrow that said "Harpys."  Underneath his neck was a tattoo of a star with the letter H, which is the Houston Astro's logo.  Appellant had horns tattooed on the top of his head.  The horn tattoos were significant because only a member with high status in the gang was permitted to have that tattoo.  The horns would also instill fear in people.  Appellant had the numbers "25" and "28" tattooed on his face, which signified that he belonged to the 25th Street and 28th Street cliques within the gang.  Appellant had "fuck gang unit" on the side of his head.  He also had the Aztec symbol for 13 on his face, which signified allegiance to the Mexican Mafia.  Officer Roybal explained that only certain gang members are allowed to have a tattoo as specific as the number 13, particularly on their face, which indicates that appellant had put in work for the gang and had earned the right to get the tattoo.  A gang member with a tattoo on his face who had not received permission to get the tattoo would be physically assaulted by fellow gang members.  Appellant had the initials "H.P.S" on the back of his head, which stand for Harpys, and had "Harpys" on the back of his neck.  He had the initials "D.E." tattooed below his lips, which stands for Dead End, another clique of the gang.  Below that, appellant had a tattoo of a major league baseball logo, which is only given to a gang member with high status, "a so-called clean-up hitter" or "enforcer for the gang."  Appellant also had the initials "D.E." and "H.P.S." tattooed on his arm, "H.P.S." on his chest, and "Harpys" in cursive on his chest.  Appellant had his moniker "Chito" tattooed below his face.  And he had a tattoo of a street sign on his back that signified the

7

Dead End clique of the Harpys gang. The only nongang-related tattoo discussed was "your" underneath appellant's right eye and "next" underneath his left eye.

Officer Roybal explained that only approved gang members were permitted to sell drugs, which was one of the ways the gang earned money. A gang member's status was elevated when he had the approval and earned the trust to sell drugs. When a buyer failed to pay for the drugs, the amount owed would increase each day until paid. If the buyer did not pay, he would suffer physical consequences, including death. A gang member's status would be reduced if he allowed a buyer not to pay a debt. Officer Roybal also explained that a gang member is not permitted to take credit for a crime committed by another member, because that would be stealing the other member's respect. A gang member who took credit for someone else's work would be physically assaulted by other members.

**Defense Case**

On March 28, 2013, a defense investigator spoke to Rodriguez at the county jail. The conversation was not recorded. Rodriguez told the investigator she had lied to the detectives because she wanted to get out of jail. She was positive that appellant never told her about a murder. The investigator prepared a two-page document of her statement, which Rodriguez signed, after saying it was accurate.

Daniel Laughlin testified as a gang expert. He is a certified intervention gang specialist. He was familiar with the Harpys gang, and the area of Normandie Avenue and 20th Street, which is a known drug area. He has seen both Latino and African-American drug dealers at that location. Based on his experience with drug dealers and addicts, he testified that many addicts have more than one source for drugs, and that they often ask to borrow more money than the debt owed so they can buy more drugs. It is not unusual for hardcore drug addicts to ask for money by claiming that a drug dealer has threatened to hurt them.

The manager of appellant's apartment building testified that the fenced parking lot for tenants has a small door for which she has the only key. The gate to the lot is

operated by tenants with a remote control.  Appellant, whom she knows, did not have a remote control to the gate.

## DISCUSSION

### I.  Substantial Evidence Supports Appellant's Convictions

Appellant contends the judgment must be reversed because the evidence was insufficient to prove that he (1) committed the charged murder with premeditation and deliberation or that he aided and abetted the murder; (2) personally discharged a firearm causing great bodily injury and death; and (3) possessed a firearm as a felon.

### A.  *Standard of Review*

A defendant raising a claim that the evidence was insufficient to support his conviction bears a "massive burden" because this court's "role on appeal is a limited one." (*People v. Akins* (1997) 56 Cal.App.4th 331, 336.)  "'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.)  We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053; *People v. Hoang* (2006) 145 Cal.App.4th 264, 275.)  This standard applies whether direct or circumstantial evidence is involved.  (*People v. Thompson* (2010) 49 Cal.4th 79, 113.)  "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)  Even when there is a significant amount of countervailing evidence, the testimony of a single witness can be sufficient to uphold a conviction. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)  So long as the circumstances reasonably justify the trier of fact's finding, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment. (*People v. Albillar* (2010) 51 Cal.4th 47, 60; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  Reversal is not warranted unless it appears "'that

upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### B. Premeditated and Deliberate Murder

A "willful, deliberate, and premeditated killing" is murder of the first degree. (§ 189.) In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 (*Anderson*), the California Supreme Court set forth three categories of evidence it found to be sufficient to sustain a finding of premeditation and deliberation: planning activity, motive, and manner of killing. "Contrary to defendant's suggestion, *Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive. *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse." (*People v. Pride* (1992) 3 Cal.4th 195, 247; *People v. Tully* (2012) 54 Cal.4th 952, 1008, fn. 24.)

Here, there was substantial evidence from which the jury could infer that the victim's death was premeditated and deliberate. As to the first *Anderson* factor of planning, the evidence showed that the week prior to the murder the victim acted nervous and asked to borrow money. The victim called appellant eight times and sent a text to appellant just minutes before the murder, asking to meet him to buy more drugs and to pay his debt. Cell phone records showed that appellant was in the area of the victim's death when the calls were made. Appellant was a high-ranking Harpys gang member who was authorized to sell drugs in the gang's territory and to act as the gang's enforcer in collecting "rent." Appellant brought a loaded gun to meet the victim, a weapon specifically designed to kill.

As to the second *Anderson* factor, appellant had a motive to kill because the victim owed money to appellant. The victim had a history of failing to pay his drug debt, and appellant had been covering for the victim by telling "the homie" that the victim had paid when he had not actually done so. As the gang's enforcer, appellant had to get the money from the victim or kill the victim; otherwise, appellant would suffer negative consequences for letting the debt go unpaid.

10

Finally, as to the manner of killing, appellant used a gun to shoot the victim, who was unarmed, and fired multiple times at the victim's head and neck. Appellant had earlier been at a shooting range doing target practice.

Additionally, the evidence showed that when police went to appellant's apartment the day of the murder, he climbed out of the window and fled. He then wore a disguise and went into hiding. The evidence also showed that two days after the murder, appellant admitted to Rodriguez that he killed the victim, and showed Rodriguez the gun he used. The gang expert explained to the jury that a gang member cannot take credit for a crime he did not commit, because that would mean stealing the credit from another member, and there would be negative consequences.

Viewing the evidence in the light most favorable to the prosecution and presuming all reasonable facts in support of the judgment, we conclude the jury could have reasonably inferred that the victim was unable to pay his drug debt and appellant killed him to avoid negative consequences from the gang for not collecting rent.

### C. Aiding and Abetting Murder

The prosecutor proceeded on the dual theories that appellant either directly perpetrated the murder with premeditation and deliberation or aided and abetted the murder. The prosecutor conceded that the aiding and abetting theory was based on appellant's use of the word "we" ("We took care of business," "We took care of it").

"An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (P*eople v. Chiu* (2014) 59 Cal.4th 155, 167.)

Appellant argues that the evidence was insufficient to prove that he aided and abetted the victim's killing. Given our conclusion that substantial evidence supports the jury's finding that appellant himself directly perpetrated the murder, we need not address whether the evidence also supports the prosecutor's alternate theory of aiding and abetting.

11

### D. Personal Use of a Firearm

Appellant argues that there was insufficient evidence to support the jury's true findings that he personally used and discharged a firearm in the commission of the murder because there was no evidence that he had a .40-caliber gun on May 8, 2012.

"Whether the defendant was armed with and personally used a firearm are factual questions for the jury's determination." (*People v. Jacobs* (1987) 193 Cal.App.3d 375, 380.) Here, a gun was used to kill the victim and appellant admitted that he committed the murder. Appellant showed Rodriguez the gun he used to kill the victim. On the day prior to the early morning murder, appellant fired a gun at the Los Angeles Gun Club and one of his companions purchased 50 rounds of .40-caliber ammunition. The jury could reasonably infer from the evidence that appellant personally used and fired the gun in committing the murder.

### E. Possession of a Firearm by a Felon

Appellant argues that there was insufficient evidence to support his conviction for possession of a firearm by a felon on May 7, 2012 (count 5). Specifically, he argues that his presence at the Los Angeles Gun Club on May 7, 2012, and the fact that someone in his group purchased .40-caliber rounds for a handgun, constitute insufficient evidence that he had possession of a firearm on that day.

Section 29800, subdivision (a)(1) provides in part: "Any person who has been convicted of a felony . . . or who is addicted to the use of any narcotic drug, and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." The jury was instructed with CALCRIM No. 2511 that "A person does not have to actually hold or touch something to possess it. It is enough if the person has control over it or the right to control it, either personally or through another person."

Here, appellant's presence at the shooting range with a group of people on May 7, 2012, was uncontroverted. Appellant completed the shooting range's questionnaire, which was required for him to shoot a weapon at the range. A member of appellant's group purchased ammunition at the shooting range. Appellant stipulated that he suffered

12

prior felony convictions.  The jury could reasonably infer from this evidence that appellant was a felon who had possession of a firearm at the shooting range.

## II.  Instructional Error

Appellant contends:  "The trial court committed reversible error by giving erroneous aiding and abetting instructions, which failed to instruct that the prosecution must prove appellant specifically intended to aid and abet premeditated and deliberate murder, which impermissibly lightened the prosecution's burden of proof and, thus, violated appellant's rights to due process of law under the Fourteenth Amendment and to trial by jury under the Sixth Amendment."  Specifically, appellant argues that the combination of the "natural and probable consequences" language in CALCRIM No. 520 (murder instruction) and the instructions on aiding and abetting (CALCRIM Nos. 400 & 401) failed to inform the jury that appellant must specifically intend to aid and abet premeditated and deliberated murder.

We need not address this contention for the simple reason that the jury did not find appellant guilty of murder on an aiding and abetting theory.  We know this because the jury found that in committing the murder appellant personally and intentionally discharged a firearm causing great bodily injury and death.  Because the jury found that appellant himself shot the victim, any argument regarding aiding and abetting jury instructions is moot.

## III.  Section 654 Did Not Preclude Imposition of Consecutive Sentences

Appellant contends that his consecutive eight-month sentence for possession of a firearm by a felon at the shooting range on May 7, 2012 (count 5), should have been stayed pursuant to section 654.

Section 654, subdivision (a) provides in part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

"It has long been held that section 654 bars multiple punishment for separate offenses arising out of a single occurrence where all of the offenses were incident to one

13

objective." (*People v. Calderon* (2013) 214 Cal.App.4th 656, 661.) "However, if the defendant harbored 'multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct. [Citations.]'" (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 (*Jones*).) "Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them." (*Id.* at p. 1143.)

The *Jones* court "conclude[d] that section 654 is inapplicable when the evidence shows that the defendant arrived at the scene of his or her primary crime already in possession of the firearm." (*Jones, supra,* 103 Cal.App.4th at p. 1145.) The court noted that a violation of section 29800 (formerly § 12021) is complete the instant a defendant had the firearm within his control prior to the shooting. (*Jones, supra,* at p. 1144, citing *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1410.) Thus, "it is clear that multiple punishment is proper where the evidence shows that the defendant possessed the firearm before the crime, with an independent intent." (*Jones, supra,* at p. 1144.)

Here, the evidence supported the inference that appellant harbored separate intents in the two crimes. At the shooting range on May 7, 2012, appellant possessed the gun with the intent of engaging in target practice. On May 8, 2012, appellant possessed the gun with the intent of killing the victim. "[Appellant's] use of the weapon after completion of his first crime of possession of the firearm thus comprised a 'separate and distinct transaction undertaken with an additional intent which necessarily is something more than the mere intent to possess the proscribed weapon.' [Citation.]" (*Jones, supra*, 103 Cal.App.4th at p. 1147.) That appellant may not have possessed the gun for a lengthy period before commission of the primary crime (murder) is not determinative. (*Id.* at p. 1148.)

We conclude that the trial court's imposition of the eight-month consecutive sentence for count 5 did not violate section 654.

**IV. Additional Day of Presentence Credit**

Appellant contends, and the People agree, that he is entitled to 363 actual days of presentence custody credit rather than the awarded 362 days of custody credit.

Appellant was arrested on June 20, 2012, and sentenced on June 17, 2013. Presentence credit includes all days in custody, including the day of sentencing and partial days in custody. (§ 2900.5, subd. (a); *People v. Denman* (2013) 218 Cal.App.4th 800, 814; *People v. Downey* (2000) 82 Cal.App.4th 899, 920.) Because appellant was in actual custody for 363 days, the trial court is directed to amend the abstract of judgment to reflect 363 days of presentence custody credit.

## DISPOSITION

The trial court is directed to amend the abstract of judgment to reflect 363, rather than 362, days of actual presentence custody credit, and to forward an amended copy of the abstract to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
          ASHMANN-GERST


We concur:


_____, P. J.
    BOREN


_____, J.
    CHAVEZ


15